NOTICE
Decision filed 09/02/20. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2020 IL App (5th) 180157-U

NO. 5-18-0157

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Wayne County. |
| | ) | |
| v. | ) | No. 12-CF-122 |
| | ) | |
| RAYMOND M. MORRIS, | ) | Honorable |
| | ) | Barry L. Vaughan, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE MOORE delivered the judgment of the court.
Justices Barberis and Boie concurred in the judgment.

**ORDER**

¶ 1    *Held*: Because the evidence was sufficient to sustain the six predatory criminal sexual assault of a child convictions of the defendant, this court affirms those convictions and the unchallenged sentences imposed upon those convictions.

¶ 2    The defendant, Raymond M. Morris, appeals his six convictions, following a single jury trial in the circuit court of Wayne County, for predatory criminal sexual assault of a child. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4    Because in this appeal the defendant challenges only the sufficiency of the evidence used to convict him, we must view that evidence in the light most favorable to the prosecution. See, *e.g.*, *People v. Gordon*, 2019 IL App (5th) 160455, ¶ 14. We therefore present an overview of the evidence used to convict the defendant, and present additional evidence that was properly before

1

the jury—evidence the defendant cites in support of his argument that insufficient evidence exists to sustain his convictions—in more detail in the analysis section of this order as we address the defendant's arguments therein. On August 2, 2012, the defendant was charged, by information, with one count of predatory criminal sexual assault of a child and one count of aggravated domestic battery. On August 27, 2012, the defendant was indicted on the same two counts. On February 11, 2014, an amended information was filed, charging the defendant, in what was styled as "Count III," with one count of aggravated criminal sexual abuse. On December 15, 2014, the defendant entered an open plea of guilty to only the charge of aggravated criminal sexual abuse. That plea was vacated, for reasons not relevant to this appeal, prior to the sentencing of the defendant pursuant to the plea.

¶ 5    On October 26, 2016, an amended indictment was filed. Therein, the defendant was charged with seven counts of predatory criminal sexual assault of a child and one count of aggravated domestic battery. The seven counts of predatory criminal sexual assault of a child alleged that at various times between 2010 and 2012, the defendant assaulted his then preteen biological daughter (hereinafter "the victim") by: (1) placing his penis into the mouth of the victim (on three separate occasions, as charged in three separate counts), (2) placing his mouth on the vagina of the victim (on two separate occasions, as charged in two separate counts), (3) rubbing his penis on the vagina of the victim, and (4) placing his finger in the vagina of the victim. The aggravated domestic battery count alleged that the defendant struck the victim repeatedly with a cord, thereby causing permanent disfigurement.

¶ 6    At the defendant's jury trial, which began on January 8, 2018, and concluded on January 10, 2018, the victim testified that she was born in July of 1999 and was 18 years old at the time of the trial. She testified that she was presently in her first year of college, studying cardiac radiology. She testified that she began to live with the defendant in 2010, when she was 10 years old, after

learning that the defendant was her biological father and meeting him for the first time. She testified that at first it was a nice change of pace to live with her biological father, because her previous homelife with her drug-abusing mother had been chaotic. She testified that the defendant began to sexually abuse her approximately three weeks after she moved in with him, subsequent to a home visit from a caseworker who came to make sure she was settling in well. The defendant would come into her room when she was trying to sleep and crawl into her bed with her. Eventually, when he did this, he began to put his hand down her pants, over her underwear. He did this "a few times a week." About three weeks later, he began to place his hand under her underwear, placing his fingers onto and inside of her vagina. This also happened "[a] few times a week." The victim testified that, subsequently, the defendant "proceeded to taking off [her] pants and putting his mouth on [her] vagina." At this point, the defendant would come into her room, wake her up, pull her to the edge of her bed, remove her pajama bottoms, and place his mouth on her vagina. When asked how often this type of assault occurred, the victim testified that it "happened too many times to be able to count."

¶ 7     The victim testified that "[a]bout a month or two months after [the defendant] began performing oral sex on [her], he made [her] begin performing oral sex on him." She testified that this occurred "in different places," but that it sometimes took place in the doorway of her room, after the defendant "woke [her] up and made [her] come and sit on the floor, and he pulled down his pants." She testified that he told her what to do and held her by her hair. She testified that the defendant used force to make her do this, as he had used force when he assaulted her by placing his mouth on her vagina. She testified that the defendant sometimes sexually assaulted her on the living room couch, as well as in her bedroom and bedroom doorway, and in the hallway near the bathroom. She testified that her older brother was asleep when the defendant woke up the victim

3

and assaulted her. The victim testified that she did not believe her brother—who was two years older than her—ever witnessed the assaults.

¶ 8    The victim testified that the defendant forced her to perform oral sex on him "[t]hree to four times a week" and eventually forced her to allow him to ejaculate into her mouth, holding her by her hair and forcing her head down onto his penis. About six months after the victim began to live with the defendant, the defendant also began to physically abuse her, beating her all over her body with his hands, fists, and "other objects" such as a cane, his boot, a notebook, and a vacuum cleaner cord. She testified that the defendant got drunk "almost daily" and usually beat her when he was drunk because, "[w]hen he would get drunk, he would get very, very angry." With regard to other instances of sexual assault, the victim testified that "once he rubbed his penis up and down on [her] vagina." She tried to push him away with her feet, but could not do so. She testified that she decided to flee the defendant's home after he told her, on or around her thirteenth birthday, that he was going to perform anal sex on her. She believed he was going to do so that night. She texted a friend for help, and eventually two adult members of her church came to her house to rescue her. She ran out to their car, shoeless and with only her cell phone and the little money she had, and they took her to the police, where she reported the sexual assaults for the first time.

¶ 9    The State then circled back to questions about the defendant's beating of the victim on her back with the vacuum cleaner cord, about which the victim then testified in detail. She also testified about the foster homes she lived in after moving out of the defendant's house, and about the frequency of the sexual abuse by the defendant, stating that "[i]t happened too many times to keep track of." She reiterated, however, that the defendant only placed his penis on her vagina one time. On cross-examination, she acknowledged that she had not reported the penis-on-vagina contact until 2016, when she was reinterviewed by authorities, and had not reported the assaults to anyone prior to fleeing the house in late July of 2012. On redirect examination, she explained that she did

4

not report the abuse prior to fleeing the house because the defendant had "heavily threatened" her, and that she believed his threats.

¶ 10 Also testifying for the State were, *inter alia*, an investigating law enforcement officer with the Wayne County Sheriff's Office, and the victim's two adult acquaintances from the victim's church. The law enforcement officer testified that after the victim made her initial allegations to him about the defendant, an interview was set up with the victim at a child advocacy center in Mt. Vernon, which the law enforcement officer observed from another room. He also testified as to scars he observed on the victim's back, allegedly from her being beaten by the defendant with a vacuum cleaner cord, and testified that at the request of defense counsel, he took photographs of the defendant's genitalia. He then authenticated the photographs, which were admitted into evidence and published to the jury. By agreement of the parties, a DVD recording of the victim's approximately 35-minute July 30, 2012, interview at the child advocacy center was then played for the jury.

¶ 11 During the interview, the victim described, *inter alia*, acts of sexual assault of her by the defendant that included the defendant placing his hand down the victim's pants, the defendant forcibly performing oral sex on her, and the defendant forcing her to perform oral sex on him, as well as the defendant touching her breasts while he forced her to perform oral sex on him. She described the events that caused her to flee the home the night before. She stated that the defendant physically abused her if she resisted the sexual abuse. She stated that the sexual abuse happened "every week" and more than once a week. The victim denied that the defendant had used his penis to touch her vagina, but stated that in the past he had threatened to do so.

¶ 12 Ginger Meyer, an employee of an organization that provides specialized medical evaluations for children who have alleged that they are victims of, *inter alia*, sexual abuse, testified for the State that the victim was referred to her organization by the child advocacy center in Mt.

5

Vernon. Meyer testified that she conducted a psychosocial evaluation of the victim in this case, and that the victim described both physical and sexual abuse inflicted upon the victim by the defendant, including the fact that the defendant would beat the victim when she resisted his sexual abuse of her. She testified that the victim told her that the defendant's nickname for the victim was "sex buddy." She testified that the victim told her that the physical and sexual abuse "happened all the time."

¶ 13    Dr. Kathy Swafford testified that she is a pediatrician who examines, *inter alia*, victims of physical and sexual abuse. At the request of the State, and without objection from the defendant, she was declared to be an expert witness, and testified as such. She testified that she examined the victim in this case on August 1, 2012, which was shortly after the victim's thirteenth birthday. Dr. Swafford testified that she found scarring on the victim's back that was consistent with the physical abuse reported by the victim. She testified that in light of the types of sexual assault alleged in this case, she would not expect to find physical signs of those assaults, and did not find physical signs of those assaults.

¶ 14    Following the close of the State's case, the defendant moved for a directed verdict, contending there was not sufficient evidence to convict the defendant of any of the seven counts involving sexual assault. The motion was denied. The defendant chose not to testify, and not to present any evidence. In closing argument, defense counsel stressed the fact that the victim had not reported the penis-on-vagina contact until 2016, when she was reinterviewed by authorities, and in fact had denied penis-on-vagina contact when interviewed by various authorities in 2012. Defense counsel argued that the State had only the victim's word to rely upon, and that this was a case of "accusation without corroboration." He asked the jury to consider the inconsistencies between the victim's short 2012 video interview and her testimony at trial, and to conclude that the defendant was not guilty.

¶ 15 Following deliberations during which the jury—with the consent of the parties—again watched the DVD recording of the victim's 2012 interview, the jury found the defendant guilty of all of the counts of predatory criminal sexual assault of a child except the count alleging that the defendant rubbed his penis on the vagina of the victim. The jury found the defendant guilty of domestic battery, rather than aggravated domestic battery. The defendant filed a motion for a new trial, which was denied. Following a sentencing hearing on March 9, 2018, the defendant was sentenced to 30 years of imprisonment on each of the six predatory criminal sexual assault of a child counts of which he was convicted by the jury, to be served consecutively to one another as required by statute, for a total combined sentence of 180 years of imprisonment on those six counts. The defendant was sentenced to 165 days of incarceration—time served—on the domestic battery conviction. A motion to reconsider or reduce sentence was argued and denied. This timely appeal followed.

¶ 16                                    II. ANALYSIS

¶ 17 The sole issue raised on appeal by the defendant is his contention that insufficient evidence exists to sustain any of his six predatory criminal sexual assault of a child convictions. When a defendant makes such a claim, this court, as explained above, reviews the evidence presented at trial in the light most favorable to the prosecution to determine whether any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime or crimes of which the defendant was convicted. See, *e.g.*, *Gordon*, 2019 IL App (5th) 160455, ¶ 14. We will not reverse a criminal conviction unless the evidence presented at trial is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt as to the guilt of the defendant. *Id.* We allow all reasonable inferences from the record in favor of the prosecution, whether the evidence in the case is direct or circumstantial. *Id.* ¶ 15. There is no requirement that this court disregard inferences that flow from the evidence, or that this court search out all possible explanations consistent with

7

innocence and raise them to a level of reasonable doubt. *Id*. We do not retry the defendant, instead leaving it to the trier of fact to judge the credibility of witnesses, resolve conflicts in the evidence, and draw conclusions based on all the evidence properly before the trier of fact. *Id*. As we undertake our review of the evidence under the above standard, we are mindful of the fact that it is axiomatic in Illinois that the testimony of a single witness, if positive and credible, is sufficient to sustain a criminal conviction, even if the testimony is disputed by the defendant. See, *e.g.*, *People v. Loferski*, 235 Ill. App. 3d 675, 682 (1992).

¶ 18    In this case, the defendant contends the victim was not a credible witness, claiming that there are discrepancies in her wording, and her description of events, when the approximately 35-minute interview she gave as a 13-year-old child (describing events that began when she was a 10-year-old child) is compared to the in-person trial testimony she gave more than 5 years later as an 18-year-old adult. He also points to alleged discrepancies that are based upon the testimony of others as to their recollection of what the victim reported to them, as well as things that the defendant believes are implausible. The defendant contends that "taken together," these purported discrepancies render the victim's version of events not credible, and therefore insufficient to sustain any of the defendant's six convictions for predatory criminal sexual assault of a child.

¶ 19    Specifically, the defendant raises 13 purported discrepancies/problems, which we summarize as follows: (1) the frequency with which the sexual assaults occurred; (2) the type of sexual assaults that occurred, and when each type began; (3) the whereabouts of the victim's brother at the times the assaults occurred; (4) whether there was ever a penis-to-vagina assault; (5) how often the defendant consumed alcohol to the point of intoxication; (6) whether the victim had a "pre-existing reason for disliking" the defendant based upon a statement in her 2012 interview that she "never did like [the defendant] anyway," and thus possibly had a motive in 2012 for fabricating her allegations against the defendant; (7) the victim's difficulty, during the 2012

8

interview, in recalling exactly when and where the most recent sexual assault had occurred, even though it had occurred only days before; (8) the fact that in the 2012 interview the victim stated that the defendant "covered up" the assaults, whereas at other times she stated that the defendant's threats to kill her were the reason she was afraid to report his sexual assaults of her; (9) the fact that the defendant did not *always* beat the victim when she resisted his sexual assaults, which he claims casts doubt on the victim's claims that he *ever* threatened to kill or beat her; (10) the implausibility of the assaults occurring as the victim claimed they did, in light of the small house the victim and the defendant lived in, and the fact that the victim's brother lived there too and was purportedly sleeping or awake nearby when some of the sexual assaults occurred; (11) the fact that the victim's 2016 interviews with authorities contained more explicit details than did her 2012 interviews; (12) the lack of physical evidence to substantiate the injuries the victim suffered as a result of the physical abuse inflicted upon her by the defendant, as well as differing terminology she used as to whether she was "whipped" or "beaten" and the frequency, and locations on her body, of the physical abuse; and (13) the fact that the victim did not report the sexual assaults until July 2012, just after she turned 13, despite the fact that she could have reported the sexual assaults sooner to friends, teachers, other school officials, fellow church congregants, clergy, relatives, or others.

¶ 20     We first note that we agree with the State that the defendant's microscopic analyses of the variations in the victim's story over time ignore the fact that the victim has always maintained, consistently, that the defendant sexually assaulted her on many, many occasions by touching her vagina with his hands, forcing her to perform oral sex on him, and forcibly performing oral sex on her. These are the acts upon which the defendant's six predatory criminal sexual assault of a child convictions are based, and we find her testimony at trial to be credible enough to sustain the defendant's six convictions beyond a reasonable doubt. We also agree with the State that all of the

purported discrepancies/problems suggested by the defendant on appeal were readily before the jury, and that the jury demonstrated, by rejecting the count alleging penis-to-vagina contact, that it was quite capable of sorting through potentially conflicting—even contradictory—evidence and deciding for itself to what extent the victim's accounts of the events that began when she was 10 years old and continued until just after she turned 13 years old were reliable enough to sustain, beyond a reasonable doubt, the charges against the defendant.

¶ 21    In addition, although the defendant contends, with regard to his argument about the frequency of the assaults, that "[i]t is not possible that [the defendant] sexually assaulted [the victim] about once a week and that he assaulted her three to four times a week," the defendant is wrong. A rational jury could have concluded that over the course of the more than two years during which the defendant continually sexually assaulted the victim, there were periods of time during which he did so about once a week and periods of time during which he did so three to four times a week. Indeed, such a conclusion is not inconsistent with the victim's trial testimony, detailed above, about the progression of the assaults over time. Moreover, as the defendant concedes, even during her recorded interview in July 2012, the victim reported that the sexual assaults sometimes happened more than once a week, and sometimes even more than once a day, which is completely consistent with them happening three to four times a week. Thus, there exists no inherent inconsistency in the victim's statements, and the jury was perfectly capable of recognizing the complexity of a case that involved many, many sexual assaults over a protracted period of time.

¶ 22    Furthermore, there is no discrepancy between the victim stating at one point that the defendant "covered up" the assaults, and stating at another that the defendant "heavily threatened" her: a rational trier of fact certainly could have concluded that the victim's two statements were consistent with one another, because what she meant was that the manner by which the defendant "covered up" the assaults was by "heavily threatening" her. Such a conclusion would not be

speculative, strange, or unusual in any way: jurors are instructed that they are allowed to bring their common sense and life experiences to their deliberations, and rational jurors could have believed that it is not uncommon for criminals and other wrongdoers to attempt to cover up their misdeeds by threatening their victims.

¶ 23    Indeed, we agree with the State that much of the defendant's argument on appeal is highly speculative and detached from reason, such as the defendant's suggestion that the victim's statements "strongly implied" that the first time the defendant forced oral sex upon her was the day before she fled the house. Only under an extremely strained and fragmented reading of the record could such an implication be found at all, and under no circumstances could one realistically state that it was "strongly implied." Likewise, it borders on the nonsensical for the defendant to contend that because the victim described one occasion on which she resisted a sexual assault without a resulting beating from the defendant, a rational jury could not believe that the defendant physically abused the victim on other occasions when she resisted his sexual attacks, or that a rational jury should have disbelieved other aspects of the victim's testimony as a result of this purported "discrepancy." It is also an extreme stretch of reason to suggest that because the victim stated, in her 2012 videotaped interview, that she "never did like [the defendant] anyway," the jury was required to conclude that the victim had a "pre-existing reason for disliking" the defendant and was therefore not credible in her allegations against the defendant. Moreover, even if the jury had concluded that the victim may have disliked her father when she was 13—and thus theoretically may have had a motive to fabricate allegations against him at that time—the jury reasonably could have concluded that no such motive existed when the victim was testifying against the defendant at trial after she had become an 18-year-old adult, and that it would be absurd to believe that an 18-year-old woman who had gone from living in foster homes to being a college student studying cardiac radiology would risk criminal charges and ruin to her personal and

11

professional reputation by perjuring herself as an adult over some unspecified grudge from her early teenage years.

¶ 24 We likewise do not find it surprising that during the 2012 interview the victim could not remember the exact details of the most recent sexual assault, in light of the many, many sexual assaults she had endured at the hands of the defendant over the previous years, and in light of the fact that she was a 13-year-old child, rather than an adult, and was participating in her first recorded interview regarding her allegations against her father. In addition, it is not surprising—and certainly it does not call into question the credibility of the victim—that the victim did not report the sexual assaults until she was told by the defendant that he was going to force her to have anal sex with him, an act that she believed would happen that night. Moreover, there is nothing inherently implausible about the victim's descriptions of where and when the assaults occurred, simply because the house in which they occurred was a relatively small one. This is particularly true in light of the fact that the defendant, the victim, and the victim's brother all had separate bedrooms, and the fact that to sustain the defendant's six convictions, as charged in the amended indictment, the jury had to find that only six of the many, many sexual assaults described by the victim occurred: three that involved the defendant placing his penis into the mouth of the victim, two that involved the defendant placing his mouth on the vagina of the victim, and one that involved the defendant placing his finger in the vagina of the victim.

¶ 25 Furthermore, the fact that there was no testimony about the extent to which the defendant's physical abuse of the victim left visible marks does not undermine the credibility of the victim with regard to whether the physical abuse occurred, and does not eliminate the reasonable inference that a rational jury could have drawn that the most serious incidents of physical abuse may have happened on weekends, during the summer, or during other school vacations or extended periods of time during which the defendant would have known that the abuse could easily be

hidden because few outsiders would have had access to the victim during those times. We note as well that the defendant was not charged at trial with any counts of physical abuse that would have left clearly visible marks on the victim's face, arms, legs, or other readily observable parts of her body—only with a count involving injuries to her back—and thus the State had no reason to provide evidence of such other injuries. Indeed, the defendant's trial counsel surely would have objected had the State attempted to do so, and in the face of such an objection, it would have been absurd for the State to claim that it needed to introduce such evidence so that the defendant, on appeal, could not attack the character and credibility of the victim on the basis of a lack of testimony or other evidence substantiating the physical beatings and resulting marks or injuries.

¶ 26    As explained above, when reviewing a claim such as that made by the defendant in this appeal, this court allows all reasonable inferences from the record in favor of the prosecution, whether the evidence in the case is direct or circumstantial, and will not disregard such reasonable inferences that flow from the evidence. See, *e.g.*, *Gordon*, 2019 IL App (5th) 160455, ¶ 15. Moreover, we will not search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt (see *id.*), which is exactly what the defendant asks us to do in this appeal with his list of purported discrepancies/problems.

¶ 27    We note as well that the defendant's efforts on appeal to impune the character of the victim in an effort to call into question her credibility as a witness also fall flat in light of the amount of time that passed between her initial interviews with authorities and her subsequent testimony at trial. For example, with regard to how often the defendant was drunk during the time the victim lived in the defendant's house, we note that to the extent there exists an inconsistency with regard to this tangential issue, it is an inconsistency regarding the victim's subjective perception—at age 13, and then at age 18—of the frequency and degree of the defendant's intoxication. We do not find it surprising that the victim's perception of this nonessential detail would change as she aged,

13

matured, and gained more experience in the world, nor is it alarming to us that, upon reflection at age 18, she would recognize that the defendant, when she lived with him and when he sexually assaulted her, was drunk far more often than she had realized when she was 13.

¶ 28      Likewise, we do not find it surprising that the victim, when recounting sexual assaults that began when she was 10 years old and continued on a regular basis until around her thirteenth birthday, was not completely consistent in her descriptions of the whereabouts of her brother on each of the many, many occasions that the defendant preyed upon her. Although the defendant contends that "[i]t is not possible that he usually assaulted her when [the brother] was in the home asleep and that he usually assaulted her when [the brother] was not in the home," the defendant is wrong about this as well. Just as with the defendant's argument regarding the frequency of the assaults, with regard to this argument too a rational jury could have concluded that over the course of the more than two years during which the defendant continually sexually assaulted the victim, there were periods of time during which he "usually" assaulted her when her brother was asleep in another room, and other periods of time during which he "usually" did so when the brother was not at home. Again, the jury was well aware of the complexity of the case and the length of time over which the sexual assaults occurred. As explained above, this court does not retry the defendant, instead leaving it to the trier of fact to judge the credibility of witnesses, resolve conflicts in the evidence, and draw conclusions based on all the evidence properly before the trier of fact. *Gordon*, 2019 IL App (5th) 160455, ¶ 15.

¶ 29      In short, it would defy reason, common sense, and frankly all reality to expect complete consistency from the victim on these and the other points that the defendant raises on appeal, given the fact that the defendant continually sexually assaulted the victim over a period of more than two years, from the time she was a young girl of 10 until she was barely a teenager. In addition, it would be beyond surprising if the victim's trial testimony robotically mimicked statements,

14

practically verbatim, that she had made about the sexual assaults several years before. To the contrary, the fact that the victim described some incidents in more detail in later interviews and at trial, and/or used different wording, is not evidence of a discrepancy: it simply mirrors the expected and normal development of the victim as a human being who was barely 13 years old when first interviewed about the years of sexual assaults she had endured from the defendant, and who was 18 years old when she testified at trial about the assaults. It is hardly surprising that her vocabulary would have changed. Most importantly, as noted above, what did not change was her consistent assertion that the defendant sexually assaulted her on many, many occasions by touching her vagina with his hands, forcing her to perform oral sex on him, and forcibly performing oral sex on her: assertions that form the solid foundation upon which the six convictions of the defendant rest.

¶ 30    Having thoroughly considered the factual and legal merit of the points raised by the defendant on appeal, we conclude that the standard the defendant wishes to set for this court to sustain his conviction has no basis, on the facts before us, in the law as it exists in Illinois, and we agree with the State that the cases cited by the defendant involve situations that actually strain credulity, whereas the purported problems about which the defendant complains in this case do not strain credulity at all. For the reasons discussed above, we reject the defendant's assertion on appeal that the victim in this case gave "varying accounts" that were "more characteristic of someone who is trying to impress an audience than someone trying to give an accurate description of events." Even when the issues about which the defendant complains are, as he suggests, "taken together," we conclude that the victim was a credible witness, and the evidence presented at trial, viewed in the light most favorable to the prosecution, was not so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt as to the guilt of the defendant. *Gordon*, 2019 IL App (5th) 160455, ¶ 14. Accordingly, there exist no grounds to reverse any of the defendant's six

15

predatory criminal sexual assault of a child convictions. *Id*. The defendant has not challenged his conviction for domestic battery, or any of his sentences, all of which we affirm as well.

¶ 31                                        III. CONCLUSION

¶ 32    For the foregoing reasons, we affirm the defendant's convictions and sentences.


¶ 33    Affirmed.